NEWMAN (DUBOIS v.). See Case No. 4,-108.

## Case No. 10,177.

NEWMAN v. KEFFER et al.

[1 Brun. Col. Cas. 502; [2] 33 Pa. St. 442, note.]

Circuit Court, E. D. Pennsylvania. Nov. 30, 1836.

ATTORNEYS' COMPENSATION — FEDERAL COURTS— EFFECT OF DECISIONS OF STATE COURTS—DEBTOR AND CREDITOR — PAYMENT — EXCHANGE — INTEREST RECOVERABLE ON ARREARS OF GROUND RENT—GROUND RENT—REMEDIES FOR RECOVERY —JOINT TENANT—RIGHT TO COLLECT RENT.

1. An attorney is entitled to recover a quantum meruit for his professional services.

2. Where the federal courts have jurisdiction of a suit between citizens of different states, affecting real property, they will adopt the decisions of the highest state courts as the local law of real property, whether under a statute or the unwritten law of the state.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

3. Where a rent is reserved payable in a foreign coin, it is computed at so much of the coin made current by law, as at the rate of exchange will be equal in value to the foreign coin in the country where issued.

4. Arrears of ground rent will bear interest from the time they become payable.

5. For the recovery of arrears of ground rent, the plaintiff may proceed by distress, re-entry, ejectment, and action of covenant, and proceedings in one do not suspend the others; the remedies are cumulative. Such actions will lie as well against the administrator, after decease of the covenantor.

6. One joint tenant, his executor or trustee, may receive the whole rent or appoint a bailiff to collect it.

These were actions brought by the surviving trustee of the ground rents, belonging to the Hamilton family, issuing out of lots in the city of Lancaster, to recover the rents of many lots held by each of the defendants respectively. On each of these lots the annual rent was a certain number of shillings, sterling money of Great Britain. These rents were all in arrear for many years. By the terms of the deeds reserving them, they were made payable at Lancaster annually, forever, in shillings sterling, or their value in coin current, according to the rate of exchange between Pennsylvania and London, on the day on which the rent in each year fell due. The rents varied in amount from seven shillings to ninety shillings sterling per annum. The deeds reserving them were of various dates, the earliest having been made in 1740, and the latest in 1815. The plaintiff claimed the rent for each year, at the current rate of exchange, with interest from the day on which it became payable. In two of the cases, the first and last, defense to a part of the plaintiff's demand was taken upon special grounds, particularly noticed below in the charge of the court. Except upon these grounds, the defendants' counsel did not contend that they were not liable to pay the principle of the rents in arrear, at the par of exchange. They insisted, however, that the rents having been, in former settlements of arrears, computed upon the footing of an estimate of the pound sterling as equal to only four dollars and forty-four cents, they were not now liable, by reason of any difference in the rates of exchange proved at the trial, to pay on the footing of any higher estimate. They also insisted that no interest could be recovered on the arrears of rent, or that if any were recoverable it was not recoverable for any time previous to the commencement of these suits in February or March, 1836. At par, without interest, the arrears of rent due amounted in the five cases together to......................... $2,862 74

| | |
|---|---:|
| To which the plaintiff claimed to add, | |
| Difference of exchange ......... | 218 15 |
| Interest ...................... | 1,508 27 |
| Making the plaintiff's demand in the five suits amount to......... | $4,604 44 |

In the year 1818 the legal title to all the groundrents in Lancaster (including the rents in question) had been vested in James Lyle, since deceased, and the plaintiff, in trust, to recover and receive the rents as they should become due, and sell or otherwise dispose of the whole or any part of them, and hold the proceeds in trust for the parties who had the beneficial ownership of the rents, according to their respective interests, expressed in the deed of trust. It appeared that in the first eight or nine years of the existence of this trust, the practice had been for the acting trustee to send an agent to Lancaster once or twice, or oftener, in each year, for the purpose of receiving the ground rents. This agent generally remained there for some weeks. Concerning a power of attorney under which he acted, there arose a question which is noticed in the charge of the court. During the remaining period of the existence of the trust, from 1827 to the present day, the surviving trustee always had a resident agent in Lancaster, authorized by letter of attorney to receive the rents.

Mr. Cadwalader, for plaintiff.
Kittera & Read, for defendants.

BALDWIN, Circuit Justice (charging jury). The plaintiff sues to recover rent in arrear, alleged to be due to him in virtue of the covenants contained in the deeds, by which the defendants hold, or have held, certain lots in the town of Lancaster, and adjacent out-lots. It is admitted that the title under which he claims the rents is good, and that he has a right to receive what is due; it is also admitted by all the defendants, except the representatives of Mr. Hopkins, that they are liable for such arrears as have become due on the lots occupied by them, respectively, leaving no subject of controversy except the amount actually due. Mr. Keffer claims a credit for the rent due on one of the lots held by them, because the plaintiff had distrained his goods therefor previously to bringing this suit. In our opinion, this is no ground for allowing such credit. The law gives the plaintiff cumulative remedies for the recovery of his rent, a distress, an action of covenant, a right of re-entry, and an action of ejectment, each of which he may pursue till he obtains satisfaction. In these respects, the remedies of a landlord are on the same footing as in the case of a mortgage and bond, the maker and indorser of a note, or several promises or obligations for the same debt; where all parties liable are sued, and all remedies against them are pursued, the pendency of one does not suspend the proceedings on or against another. If costs have been vexatiously incurred, the law acts in relation to them as the justice of each case may require; but they cannot deprive a plaintiff of his right to recover in an action properly brought, whatever is justly due on the contract sued on, though there may be another proceeding depending, in which he claims the same thing. We therefore instruct you as matter of law that this credit cannot be allowed. It is objected on behalf of Mr. Hopkins' administrators, that they are liable only for the rent which became due during his lifetime, because the covenants in the deed by which he held the lots is not an express one, the obligation of which does not devolve on his personal representatives. We think this objection will not avail them, and instruct you that by the legal operation of the deeds Mr. Hopkins was personally bound and his administrators now liable. As these questions affect but a small amount of the sum claimed, we have not examined them as thoroughly as we otherwise should have done; they will be considered open to future argument should the counsel desire it. If we should be in error, it can be corrected by entering a remittitur for the amount of the rent due by Mr. Keffer, which has been distrained for, and what has accrued on Mr. Hopkins' lots since his death. As to the off-set claimed on behalf of Mr. Hopkins, for his professional services to the plaintiff, or the Hamilton estate, the law is now well settled, though it was once questioned; he is entitled by law to recover such compensation for his services as they were worth, though no agreement may have been had on the subject. You will ascertain from the evidence what services Mr. Hopkins had rendered, as well as what would be a fair and reasonable compensation; it seems that he received one hundred dollars, which Mr. Reigart thinks an ample sum for any services which may have been rendered in the cases referred to in the account presented by the administrators. On this subject you will do what you think is justice, and credit such sum as you may think Mr. Hopkins was entitled to for services actually performed, without deducting anything therefrom on account of his afterwards declining his professional connection with the Hamilton estate. A professional gentleman has also a right to claim a proper compensation, on being retained or required not to act or advise professionally, adversely to the person so retaining him, or he may be retained to act generally in all cases and matters in which the other is interested. From the letter of Mr. Hopkins to General Cadwalader, the retaining was of the latter description, and a positive engagement as the counsel of the Hamilton estate; and if you are satisfied that Mr. Hopkins declined acting as counsel of the estates, for no other reason than that stated by Mr. Reigart, and in consequence thereof that other counsel have been employed, no credit ought to be allowed on account of such engagement beyond what will compensate Mr. Hopkins for his actual services. This is a question of fact, which is submitted to you, to decide what services were performed, what is a reasonable compensation, and whether it has been received.

Before we bring to your attention the interesting grounds of controversy between the parties, we will notice some matters which have been the subject of remark in the course of the argument. Complaint has been made that the plaintiffs have resorted to this court for a remedy, instead of the courts of the state, but the right so to do has not and cannot be questioned. The reasons why he has done so are no part of the merits of the causes on trial, or a proper subject of your or our inquiry; for whether plaintiff's reasons for suing here are good or bad, is for him and his counsel alone to judge. It is well known that by the laws of this state a plaintiff must sue and have his cause tried in the county where the defendant is found; the venue or place of trial can be changed only by a special act of assembly. In this case the plaintiff may have been unwilling to try his causes before a local jury sitting in Lancaster, where there may be some excitement prevailing, on account of the general interest which is felt in the questions at issue between the parties. Suffice it to say, that the constitution of the United States and the judiciary act give to the citizens of other states the option of suing in this or a state court, on causes of action exceeding in amount five hundred dollars; the reasons for constituting a tribunal of a national character to decide controversies between citizens of different states, and our own citizens and foreigners, have ever been deemed wise and just, and impose on juries and courts the duty of so exercising our respective functions, as not to disappoint the just expectations of the plaintiff, or give to the defendant any just cause to regret that he has been brought within our jurisdiction. We must administer the jurisprudence of the state in this court, as it bears on the rights of the parties, and decide between them precisely as the courts of the state ought; in these causes no question arises on the constitution, laws, or treaties of the United States. We are, therefore, bound by the thirty-fourth section of the judiciary act [1 Stat. 92] to make the laws of the state the rule of our decision, so far as they apply, and to take the settled decisions of the supreme court of the state, on the construction of state laws, as a part of the laws themselves. Our decision ought to be the same, which in our opinion the learned and much respected judge who presides in the court at Lancaster would make on the causes now before us, without turning to cases referred to by counsel, not connected or having any bearing on the merits of those now on trial. Reference has been made to some part of the opinion of Judge Hayes, in Franciscus v. Reigart [4 Watts, 98], in relation to the facts in evidence in that cause, but though we cannot doubt the entire correctness of the judge's review of that evidence, it cannot be noticed as tending to prove any fact which has the least bearing in these cases. Adjudged cases in books of reports are referred to for the questions of law which have been decided, but are not to be taken as any evidence to the jury of the facts therein stated.

We now come to the matters in issue between the parties, which arise on the deeds under which they hold the property on which the rents claimed have accrued; as all the deeds are similar in substance, if not in words, the one from James Hamilton, the elder to Mary Dougherty, dated in 1740, is especially referred to. It is an indenture, which the law deems to be the act of both parties, speaking in the words of the indenture, which is to be taken and held most strongly against the grantor as to the estate conveyed and most strongly against the grantee as to the rent to be paid, so as to give the parties respectively the mutual benefits intended. It is a grant of a certain lot in fee, for and in consideration of the rents and services therein reserved, to be paid and performed by Mary Dougherty, her heirs and assigns; each party has an estate in fee, the grantor in the lot, the grantee in the rent: the rights of the parties depend on the deeds without any incidents of tenure which can affect the contract as a grant, with no other reservation than what is expressed on its face, which are rents and services. The rents are seven shillings sterling, etc., annually; the services are the erection by the grantee, at her cost, of a substantial dwelling-house of sixteen feet square, etc. The residue of the deed refers to the remedies of the grantor to enforce the payment of the rent, and the erection of the house. On the house being finished, the lot became discharged from all services, with no other charge or encumbrance upon it, except the payment of the rent, which is the only benefit that can accrue to or be received by the grantor, as the consideration or equivalent, in the nature of purchase-money, for the estate granted. It does not appear that the Hamilton estate was under any rents or services to the proprietary, nor is it alleged that the title by which it was granted was made subject to any reservations; no question, therefore, can arise as to the tenure by which the site of Lancaster was held, at the time of and before the present grant. James Hamilton, the unencumbered owner in fee, granted this lot subject to specified rents and services; the grantee performed the service for his own benefit as to engagement, but for the benefit of the grantor, merely as a security or pledge for the payment of the rent which was concomitant with the estate, so long as it continued. These kinds of grants have been common from a very early period after the first settlement of the province. The rents reserved upon them in proprietary grants have been called quit-rents; in other grants, ground-rents, as terms of common use, and rents charge, fee farm-rents, or rents service, as defined in the books of the law. But by whatever name they may be called, their

nature depends on the deeds reserving them, which define the remedy for their payment, and the case in which the estate granted reverts. Whether these rents were reserved by the proprietaries of the province, or those who held under them, they were considered as an estate in the land granted, which was subject to taxation as other property, from which even the proprietary was not exempt before the Revolution. After the state had taken to its own use the whole estate of the Penn family, except their manors and other private property, for the consideration of one hundred and thirty thousand pounds sterling, to be paid to the proprietaries, they were charged with seven thousand pounds currency, for the arrears of taxes due on their quit-rents, on lands granted by them before 1779, when their title had become vested in the state. 3 Dall. Laws, 475. The taxes due the state were exacted, though the rents were not paid, and continued to be assessed on their manor quit-rents, as a part of their private estate, as had been done before the Revolution. Vide Act 1755 (Miller's Laws, 53); Act 1757 (Miller's Laws, 73); Act 1758 (Miller's Laws, 92.) "All ground-rents" were made liable to taxation by the acts of 1779, as well as the proprietaries' proper estate. 1 Dall. Laws, 807. By the act of 1782, "houses, lots of ground, and ground-rents" are made taxable. 2 Dall. Laws, 8. So by the act of 1795, "the amount of the ground-rent, on account of the said houses, lands, and lots of ground respectively, or either or any of them, reserved, charged, and payable." 2 Dall. Laws, 746. So by the act of 1799. 4 Dall. Laws, 511. By the act of 1705, for the collection of the proprietary quit-rents, the persons who hold under them by deeds reserving a quit-rent are called freeholders. Miller's Laws, 31–33. So that it must be considered that the estate of the grantor in the rent reserved, and of the grantee in the land granted in fee, partakes of the attributes of other real estate, and has been so held for all purposes from the earliest time. 2 Yeates, 24; 2 Watts, 26. The rent was the purchase-money charged upon the land forever. When due, it was a debt which was recoverable by the grantor, his heirs, or assigns, as any other debt, it was for a sum certain in sterling money or wheat, payable or deliverable at a certain time and place, and could be apportioned on alienation. 2 Watts, 32, 33.

With this explanation of the nature of ground or quit-rents, we will now proceed to ascertain what is the rent reserved in the grant to Mary Dougherty; the words reserving it are these: "Yielding and paying therefor and thereout unto the said James Hamilton, his heirs and assigns, at the said town of Lancaster, on the first day of May, yearly, forever hereafter, the sum of seven shillings, sterling money of Great Britain, or the value thereof in coin current, according as the exchange shall then be between the said province of Pennsylvania and the city of London." The first question which has been raised on this clause of the deed is as to the payment of exchanges on the amount of the rent, which you observe is seven shillings sterling, and is all that can be required; but it must be paid in shillings sterling of Great Britain, that is, in current coin of that kingdom, which is worth seven shillings sterling there, unless the alternative pointed out in the deed is complied with, "or the value thereof in coin current," etc. This is the equivalent or substitute for the seven shillings sterling, which means, as much of the coin made current by law when the rent becomes due as according to the rate of exchange between Pennsylvania and London will be equal in value to seven shillings sterling in London. As an example, if payment is made in Spanish milled dollars, which is a coin current in Pennsylvania, at four shillings six pence sterling, but in London are worth only four shillings two pence sterling, as bullion there; four pence sterling must be added to each dollar to make the four shillings six pence in London; on the other hand, if the dollar is worth four shillings ten pence in London, it must be taken at that here. By the agreement of the parties the rent is payable in shillings sterling, or their value in other coin, which is a legal tender for debts in Pennsylvania (which is the legal meaning of current coin [U. S. v. Gardner] 10 Pet. [35 U. S.] 620), according to its value as regulated by the rate of exchange. This is what the deed defines as the equivalent for the stipulated rent. It is in effect the same as rent reserved of so many bushels of wheat, or its value, in any particular place; if the wheat is delivered at the time and place stipulated, the rent is extinguished; if not so delivered there, then so much money must be paid as will be equal to the value of the wheat at the place agreed on. In this deed the parties agreed that the standard of the value of the coin current in the province should be its worth in London in sterling currency—so that the quantum of rent should be the same as if paid in shillings sterling in Lancaster, or as much coin current as would purchase the same number of shillings in London. Such is the express contract of the parties, which is not prohibited by any law of the state or of the United States, and nothing has been given in evidence from which you can legally infer that the terms of the deed have been varied by the parties, or which will prevent the plaintiff from recovering either the amount in shillings sterling or the agreed equivalent. Though the persons who have been entitled to the rent have been willing to receive it in current coin at the par of exchange, when it is paid on the day or on demand, that cannot bar them from claiming according to the terms of the deed, when they are put to the vexation and ex-

pense of a course of litigation to recover it. From the state of the currency in Pennsylvania, stipulations of this kind were necessary; acts of assembly for "appointing the rate of the money or coin in the province, in 1700, and for the better ascertaining the rates of money in payments made upon contracts according to the former regulations," in 1705, were repealed in council. Miller's Laws, 9, 44, 45. Also one passed in 1709, "for ascertaining the rates of money for payment of debts," etc. Miller's Laws, 51. The reason for the repeal was that by the 6 Anne, c. 30 (4 Ruff. 324), the value of foreign coin was directed to be of a uniform value in all the colonies. which value was fixed by that statute. Hall & Sellers, Addendum, p. 2. In consequence whereof it became the common practice of reserving rents payable in sterling money, or so many bushels of wheat. The latter appears to have been reserved even on grants of city lots. 2 Dall. Laws, 397. No mode therefore remained of ascertaining the value of a shilling sterling by law as the rent became due, until it was done by act of congress, which would have been the rule for computing it in contracts, if a different one had not been made; it is now a rule, where sums of money are estimated in pounds sterling, on contracts to be performed within the United States, but it is otherwise when the debt is payable in England. In the Philadelphia Library Co. v. Ingham we find a rent reserved in 1747, of twenty-one pounds sterling, as it passes in the kingdom of England, on the first of March in every year for seven years; and afterwards for one hundred years for the rent of twenty-five pounds sterling money, as it shall pass in the kingdom of England on the first of March yearly, yet no objection was made to the validity of such a reservation of rent accruing after congress had regulated the value of the pound sterling in dollars. 1 Whart. 74, etc. Though the distress was made only for the twenty-five pounds sterling at its par value here, there could be no good reason why the parties could not as well stipulate for the payment of rent according to the value of the currency in England, as in English currency; or when they have so stipulated, why one part of the stipulation should not be as obligatory as the other. You will therefore consider the rent reserved by this deed as seven shillings sterling, or as much coin made current and a legal tender by the acts of congress, as is equal in value to seven shillings sterling in London, on the days it became due.

The next question is whether the plaintiff is entitled to interest on the arrears of rent, which must depend on the law of the state. The sum due is certain, if paid in shillings sterling, and is capable of being ascertained to a certainty, if paid in coin current by law; it is due by a covenant, and is payable at a particular time and place; it is also in effect

the purchase-money of the lots, the only consideration which can be received, or in any event accrue to the grantor or his heirs. For the right of re-entry, and holding the lots as of his former estate, in case the rent is not paid, however binding at law, is in equity considered only as a penalty from which the grantee would be relieved on paying the arrears with interests, etc., unless his conduct had been such as to give him no standing in a court of equity, which would be only in a very strong and clear case for the grantor. On principle, then, the case of ground-rents comes within the rules long since settled by the supreme court of the state, that money due by bond, covenant, and bill, bears interest from the time of payment; so of the purchase-money of land, where the purchaser is in possession, and the money is due by the terms of the contract; so where there is an open account between parties, and the money has become due by their agreement, or according to a settled usage applicable to such accounts. 6 Bin. 162; 12 Serg. & R. 398; 17 Serg. & R. 391; 2 Watts, 201. Why should a debt for rent be an exception to a rule so general and just? As a matter of policy, landlords can afford to be indulgent when they can recover interest on their rents; but if their indulgence is a forfeiture of interest, they will be compelled to distrain, re-enter, bring ejectments, or sue on the covenant. When the landlord is made safe, and put on the same footing as other creditors, poor men can not only procure houses to live in, but purchase real estate, on payment of interest on the purchase-money, having a perpetual credit for the principal, while they are punctual in paying the rent and interest. You have seen that the effect of exempting so much of the tenant's property from distress, for rent, as not to leave sufficient as a security to the landlord, has been the passage of an act of assembly in 1825, compelling tenants to give security for the rent in certain cases, or surrender possession of the property. Sound policy and humanity to tenants, therefore, would require that interest should be recoverable on rents, if no law forbids it; it is the only way to avoid the expense and vexation of distress and replevin, ejectment, and bill in equity, actions of debt and covenant, the costs of which fall on the tenant, while the litigation diminishes the value of the rent to the landlord, and punctual tenants find it to their interest to become litigious. If a discrimination is made between interest on rents by leases for years, and ground-rents reserved on deeds in fee, it ought to be in favor of the latter, for the land does not revert; whereas the land comes back to the landlord after the end of the lease, and he derives all the benefit of its rise in value; besides, the ground-rent is the purchase-money of the fee simple, but the rent for a time is only the estimated value of the annual use of the land. Another and still stronger reason in

favor of the ground landlord arises from the laws subjecting ground-rents to taxation as a distinct estate in the land; while rents arising from leases for years are not assessed separately from the land itself, and ground-rents are assessed according to their value as reserved in the deeds. Whether the grantee pays them or not, the grantor is obliged to pay his annual quota on the whole rent reserved. If a vendor of land for a sum in gross was compelled to pay a tax on the annual interest falling due, it would be deemed a great hardship on him if the law would not permit him to recover the interest from the purchaser; so if the money was payable by installments, and a tax was assessed upon them. It has been urged in argument that the quit-rents of the proprietaries did not bear interest, and that ground-rents therefore do not; but no such principle is to be found in any act of assembly or decision of the supreme court of the state. That it was not the practice of the proprietaries to demand interest, may be very true; but it has nowhere been held that there were no cases in which they could not recover it; on the contrary, we find that whenever the court alludes to this practice of the proprietaries, an exception is made that when there has been unreasonable or vexatious delay in paying the rent, the least compensation is interest. 2 Yeates, 73; 4 Yeates, 265; 6 Bin. 162. By an act of assembly passed in 1705, for the more easy and effectual collecting of the proprietary quit-rents, on notice given by the receiver, the freeholders and others were obliged to pay their rents at a certain time and place; in case of neglect, the receiver was authorized to distrain, and if no distress could be found, to sue for and recover the rent by action of debt, as any other debt could be recovered by law. Where the quit-rents were due by non-residents, a special remedy was provided for their recovery, by suit in the county in which the land lay, judgment, execution, and sale in the same manner as other lands may be sold on execution. Miller's Laws, 31, 33; Hall & Sellers' Laws, 41, 43. It would seem to be the fair and obvious construction of the law, that when rent is directed to be recovered as other debts, by suit and sale of the land on which it is reserved, interest was recoverable by the same rule which applies to other debts. Another law was passed on the same subject in 1739, which was approved in council (Hall & Sellers, 192, 193); and so far from proprietaries' quit-rents ever being put on a footing less favorable than other ground-rents, they were especially excepted from assessment for the road tax, by the act of 1772. 1 Dall. Laws, 624. In 1760 a committee of the privy council recommended a repeal of an act of assembly unless, among other things, it was so altered and amended "that the payment by the tenants to the proprietaries of their rents shall be according to the terms of their. re-

spective grants, as if the act had never passed"; which was agreed to by Dr. Franklin and Mr. Charles, the agents of the province, who pledged the assembly thereto. Hall & Sellers, 278. By the act of 1779, for vesting the estates of the proprietaries in the commonwealth, the right, title, and estates of purchasers under them are confirmed according to the grants and conveyances thereof (section 7); and "the private estate of the proprietaries, their manors, together with the quit or other rents and arrearages of rents reserved thereon, are confirmed, ratified, and established forever," "as in and by the reservations, grants, and conveyances thereof are directed and appointed" (section 8). 1 Dall. Laws, 824. It must then be considered as a settled principle that even proprietary ground-rents were recoverable, according to the terms of the deeds of reservation, as other debts, and with the incident of a liquidated debt, interest as a compensation for the delay of payment. But even admitting that interest is not recoverable on proprietary quit-rents, we have the declaration of the late chief justice that the inference that other ground-rents did not bear interest, had been made "without sufficient consideration" (6 Bin. 162); and of Judge Yeates that "we are no longer in trammels on the score of proprietary quit-rents" (6 Bin. 166), since their abolition by the act of 1779, except those due on grants of their private estate, or parts of their manors, which still remain on the same footing as other ground-rents.

In Obermeyer v. Nichols [6 Bin. 159], the supreme court held that interest was payable on rent, on the same principle as on other liquidated demands, and was recoverable in an action of covenant, as matter of law, unless under special circumstances. As to ground-rents, they recognized the principle that when there was a clause of re-entry interest ought to be paid, because equity would relieve only on payment of the rent and interest, and consider them as on the same ground as other rents. Purchase-money, from the time it becomes due, bears interest though no demand is made (6 Bin. 435; 5 Rawle, 262, 263); so an action of covenant lies for a ground-rent as soon as it is due, without a demand. 3 Pen. 464, 465. On a recognizance in the orphan's court, for securing to a widow the interest on her third part of the money at which an estate is valued, the act of 1794 makes it recoverable as rent; the supreme court hold the widow's interest to be in the character of annuity, of interest on money, and a rent-charge, and that if the interest be not punctually paid, the widow shall recover interest on the interest from the time it became due. 2 Watts, 203. There cannot be a stronger case; for as a widow's annuity partakes of the character of a rent-charge, a rent-charge partakes of the character of the annuity, and it is so considered by the court, who put it on the same

footing as to bearing interest. The reason is the same in both cases; the annuity is in the nature of maintenance income, and bears interest if not paid punctually, because it is in lieu of the widow's share of the profits of the land, and all that is reserved to the widow; the rule is the same as to ground-rent, as it is of the same nature. But a court never inquires into the fact, whether the annuity or the rent is necessary for the support of the widow or the ground landlord; the rule is the same whether they are rich or poor, being founded in the nature of the debt, and the manifest justice of interest being paid as a compensation for withholding payment. 2 Watts, 203. On these principles which have been established by the supreme court, we give it to you as our decided opinion, that interest is recoverable on ground-rents as a part of the contract of grant, unless in cases where there are such circumstances as make an exception to the general rule. If it is an ordinary case, interest is payable as a matter of law. Circumstances which make exceptions are matters of fact. Courts do not direct interest to be allowed in the name of interest, but leave it to the jury to find it or not, where there is no usage to pay it, no time fixed for payment of the principal, no account rendered, or demand of payment made. 12 Serg. & R. 398. But where there is a usage, the time fixed or demand made, the jury are directed to find it. 17 Serg. & R. 391. Thus the jury were so directed, in case of the widow's interest, on the orphan's court recognizance (2 Watts, 201); on the other hand, where an annuity was given to a widow, charged on land, in lieu of her dower, and she had made no demand for several years, the court left it to the jury to allow interest or not on the arrears, as they should think that she had lived on the land or not (17 Serg. & R. 390). When the landlord resorts to the land for payment of rent, he shall not recover interest. 2 Bin. 153, 154; 17 Serg. & R. 391. When his conduct has been unfair, oppressive in exacting too much rent, when he has given reason to believe that he did not want his rent, and the tenant has been willing to do justice by paying what is due, the jury have a discretion to find interest or not. 6 Bin. 162; 17 Serg. & R. 391. But a demand of the rent on the premises puts the matter beyond a doubt, that interest must be paid; the mere not distraining is no evidence of an intention to relinquish the interest; and if the tenant knows that the landlord wants his money, and does not pay what is justly due, he is not excused from paying interest. This is the law of the state which you will apply to the evidence. It is not necessary for the plaintiff to prove a demand on the day the rent is due, or a specific demand of each year's rent; it is sufficient that he or his agent attends at a convenient time and place in Lancaster, and gives notice of his readiness to receive the rents; where the rents of the whole city are payable on the same day, to the same person, a reasonable demand or notice is all that is required. If you believe the witnesses, this has been sufficiently proved, in point of law, to come within the established rules of the supreme court; in point of fact, you will decide whether there has been such reasonable demand or notice, as the nature of the case requires. There is clear evidence on this subject, and the defendants have offered nothing to rebut or contradict it. If you find such demand or notice, the law is clear that if the rent is not then paid, the plaintiff has a right to recover interest from the time the rent became due, as a matter of contract and law; unless you shall find that there are some special circumstances, which make these cases an exception to the general rule. What these circumstances are, is for you to decide as matter of fact. Their sufficiency in law to make out an exception is for the court to decide; for instance, Tilghman, C. J., declares that the mere not distraining for rent when it is due, is no evidence that the landlord intended to relinquish interest, and that a demand of payment on the premises would put the matter beyond a doubt; there would, in such cases, be no fact to decide; so if the tenant knows the landlord wants his money, and is guilty of unreasonable or vexatious delay, the law compels him to pay interest. On the other hand, if the landlord has acted unfairly or oppressively by demanding too much, or otherwise, while the tenant has been willing to do justice by paying what is really due, in such cases, the question of interest is in the discretion of the jury; so if the landlord has given good reason for believing he did not mean to exact interest, provided the tenant was willing to pay the rent demanded or wanted. But the practice of the landlord or his agent not to demand exchange or interest from punctual tenants is not such a circumstance as to authorize a jury to apply it to those who have had no inclination to pay, but have put the landlord to the delay, vexation, and expense of litigation, and who have suffered arrears to accumulate till the interest nearly equals the principal. When interest and exchange are demanded by suit, from a tenant who offers to pay his rent at par, on notice, it will be the time to decide what law and justice require; no such case, however, is now before us; none of the defendants have shown an offer or willingness to pay anything; the evidence is full to the contrary. As an illustration of the effect of applying the same rule to punctual and delinquent litigant tenants, take the cases of Mr. Ross and Mr. Keffer, who occupy parts of the same lot. Mr. Ross has paid his rent punctually, Mr. Keffer has paid none for years; if he is not to pay interest, he will be largely the gainer by the delay and litigation. If the case is otherwise clear, such an effect ought to be avoided as a bad example in society.

In referring to the grounds of defense taken

in the argument, we find little, if anything, which contradicts the justice of the plaintiff's claim to all he demands. It has been objected that the power of attorney from Mr. Lyle to Mr. Ellis was defective, because he did not sign it as trustee. though he signed it as administrator and otherwise; but it is a well-settled rule of law, that if a man has competent power to do an act, and misrecite his power, the act is valid notwithstanding. The act will be referred to the authority which will make it legal and operative. It is also objected that Mr. Lyle was a joint trustee with Mr. Newman, and could not appoint an agent alone; the law is otherwise; one joint tenant, trustee, or executor may receive the whole rent, or appoint a bailiff to collect it. In this case, too, there is sufficient evidence to prove the assent of Mr. Newman to the agency of Mr. Ellis, and an authority by parol is sufficient. Unless, therefore, you shall find that there are such circumstances in these cases, or any of them, as come within the exceptions to the general rules in relation to interest, it is due to the plaintiff as matter of law; he is also entitled to recover the exchange by the plain and express terms of the contract. the obligation of which cannot be impaired. In conclusion, we will remark that when the rights of a landlord are clear, their enforcement according to the settled principles of law will insure comfort and protection to the tenant.

In each case the jury found a verdict in favor of the plaintiff. The verdicts, together, amounted to $4,604.44, the full sum claimed by the plaintiff, including difference of exchange and interest.

The defendants' counsel afterwards moved for a new trial and in arrest of judgment. On the 13th December, 1836. these motions were overruled without argument. and judgment was entered for the plaintiff on the verdicts.

NOTE. Interest is payable on arrears of ground rent from the time they become due. See Beaver Co. v. Armstrong. 44 Pa. St. 64, approving this doctrine as laid down in above case.